## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

KRISTA EILEEN MOSER,               :

     Plaintiff,                         :
                               Case No. 3:15cv00383

  vs.                                :
                               District Judge Walter H. Rice

NANCY A. BERRYHILL,                :   Chief Magistrate Judge Sharon L. Ovington
Commissioner of the Social
Security Administration,           :

     Defendant.                         :

---

## REPORT AND RECOMMENDATIONS[1]

---

### I.    Introduction

       Plaintiff Krista Eileen Moser brings this case challenging the Social Security Administration's denial of her applications for Disability Insurance Benefits and Supplemental Security Income.  She filed her applications on November 3, 2009, asserting that she had been under a disability starting on August 22, 2005.  Her health conditions include, at a minimum, chronic pelvic pain, fibromyalgia, chronic fatigue, and depression. (Doc. #5, *PageID* #581).

       On two previous occasions (in 2011 and 2013), two different Administrative Law Judges denied Plaintiff's applications because they concluded she was not under a

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

disability.  *Id*. at 186-200, 219-33.  The Social Security Administration Appeals Council rejected each of these decisions and remanded for further consideration.  *Id*. at 212-14, 248-49.  After the second remand, a third Administrative Law Judge, Elizabeth A. Motta, took up Plaintiff's case.  She held a hearing and later determined that Plaintiff was not under a disability and not eligible for benefits.  *Id*. at 55-75.

In the present case, Plaintiff challenges ALJ Motta's non-disability decision.  The case is before the Court upon Plaintiff's Statement of Errors (Doc. #10), the Commissioner's Memorandum in Opposition (Doc. #12), Plaintiff's Reply (Doc. #14), the administrative record (Doc. #5), and the record as a whole.

## II. <u>Background</u>

### A.    **Plaintiff and Her Testimony**

Plaintiff was thirty-eight years old on the date her asserted disability began (August 22, 2005).  This placed in her in the category of a "younger individual" for purposes of resolving her applications for benefits.  *See* 20 C.F.R. § 404.1563(c).  She has a high school education, an Associate degree, and past work as a user supply analyst, office manager, automobile services manager, and automotive leasing sales representative.

At the hearing Administrative Law Judge Motta held in August 2014, Plaintiff testified that she was unable to work because she "suffer[s] from depression and fibromyalgia, chronic myofascial pain, and spinal stenosis and anxiety…."  (Doc. #5, *PageID* #101).  It is worth pausing here to distinguish fibromyalgia from myofascial pain

2

syndrome.  Fibromyalgia is "a complex medical condition characterized primarily by widespread pain in the joints, muscles, tendons, or nearby soft tissues that has persisted for at least 3 months."  Soc. Sec. R. 12-2p, 2012 WL 3017612, *2 (July 25, 2012).  "Myofascial pain syndrome is a chronic pain disorder.  In myofascial pain syndrome, pressure on sensitive points in your muscles (trigger points) causes pain in seemingly unrelated parts of your body.  This is called referred pain."[2]

Returning to Plaintiff's testimony, she noted that she also has trichotillomania and attention-deficit/hyperactivity disorder.[3]  *Id*.  Dr. Ballerine treated Plaintiff psychiatrically starting in 2010.  Before then, she was treated by Dr. Mahajan.  Medication helped her "to a certain degree."  *Id*.  She feels she "has gotten medication to probably about the best that I can get them."  *Id*. at 102.  She was psychiatrically hospitalized in 2010.  *Id*.

Plaintiff lives with her oldest daughter, who was age twenty-one at the time of ALJ Motta's hearing.  Plaintiff has a driver's license, owns a car, and drives once or twice a week for short distances to her doctor's appointments.

Plaintiff's treatment for fibromyalgia included physical therapy, and medications such as Neurontin and a muscle relaxer and Vicodin and Mobic.  *Id.*  She acknowledged that she abused drugs (cocaine) in 2006.  She thinks she smoked pot in 2010 but only one

---

[2] http://www.mayoclinic.org/diseases-conditions/myofascial-pain-syndrome/basics/definition/con-20033195

[3] Trichotillomania is also known as hair-pulling disorder, is a mental disorder involving a recurrent and irresistible urge to pull out hair from the scalp, eyebrows, or other areas despite attempts to stop.  *See* http://www.mayoclinic.org/diseases-conditions/trichotillomania/home/ovc-20268509.

time.  *Id*. at 103.  She abused "a little bit" a muscle relaxer, Soma, "[b]ut that was years

ago."  *Id*. at 104.

Plaintiff testified that she has fibromyalgia and chronic myofascial pain.  She has

some good days and some bad days, noting that she sometimes has "really bad weeks."

*Id*.  A home health aide comes to her house daily for three hours because she trips and

falls "quite a bit."  *Id*.  Plaintiff sometimes, on a good day, works with her home health

aide to do household chores, such as laundry.  *Id*. at 105.  She explained, "Other times I'm

completely bedridden …, *id*., and the home health aide takes care of everything, even

helping Plaintiff get a bath or take a shower.  Plaintiff noted she doesn't go anywhere on a

regular basis except her appointments.  She uses her home computer for 15 minutes at a

time.

During a typical day, Plaintiff testified that she lies in bed and watches television

"the majority of the time."  *Id*. at 106.  She "used to be very social," *id*. at 109, but has lost

touch with a lot of friends.  She enjoyed a little gardening (once or twice a week for one to

two hours).  But she had not been able to garden during the year before ALJ Motta's

hearing.  *Id*. at 111-12.  Plaintiff also experiences a lot of anxiety, especially when she is

in a lot of pain.  *Id*. at 115.

**B.    Medical Evidence and Opinions**

**<u>David Mesker, M.D.</u>**

In April 2007, Dr. Mesker completed a Basic Medical for the Department of Job

4

and Family Services in which he concluded that Plaintiff is unemployable due to chronic lower abdominal pain/pelvic pain, chronic low back pain and anxiety/depression.  At that time, Dr. Mesker was arranging for physical therapy, pain management, and psychiatric counseling.  *Id*. at 1449-50.

In August 2011, Dr. Mesker completed a Physician's Certification to discharge Plaintiff's student loans due to disability.  He opined that Plaintiff was disabled due to fibromyalgia, attention deficit disorder, depression, anxiety, chronic abdominal pain, and chronic low back pain.  Dr. Mesker noted that Plaintiff "is unable to stand or sit for even short periods of time to be productive in any job."  *Id*. at 1676.  One month later, Dr. Mesker stated that Plaintiff could perform sedentary work.  *Id*. at 1685-86.

In October 2012, Dr. Mesker completed another Physician's Certification to discharge Plaintiff's student loans due to disability.  He reported that Plaintiff's impairments would prevent her from engaging in work for a continuous period of not less than sixty months.  He noted that Plaintiff can sit, but she requires frequent shifting and stretching, and she can only stand or walk for short periods of time and would be able to lift ten to fifteen pounds.  *Id*. at 1879-80.

In November 2012, Dr. Mesker prescribed shower chair and a disability placard.  In the latter prescription, he explained, "Patient is disabled due to Fibromyalgia and Chronic low back pain."  *Id*. at 2440.

Dr. Mesker completed a questionnaire in February 2013 rating the impact

5

Plaintiff's mental impairments would have on her ability to perform work activities.  The scale used in the form was from "moderate" to "moderately severe" to "severe."  The form defines the phrase "moderately severe" as, "An impairment which significantly limits mental capacity to perform basic work related functions."  *Id*. at 2146.  Dr. Mesker indicated that Plaintiff was limited to a "moderately severe" degree in ten areas—for example, in her ability to perform complex tasks, to achieve goals and respond to time limits, to sustain attention, and to tolerate stress in the work environment.  *Id*. at 2146-48.  Dr. Mesker's diagnoses consisted of attention deficit disorder, chronic anxiety/depression, fibromyalgia, chronic abdominal pain, chronic back pain.  He noted that he based his opinions on "subjective findings (there are no objective findings)."  *Id*. at 2148.   His prognosis for Plaintiff's conditions was fair to poor.  That same day, Dr. Mesker completed a physical capacities evaluation in which he opined that Plaintiff would be precluded from sedentary work.  *Id*. at 2150-51.

### Miami Valley Hospital

Plaintiff went to the emergency room in May 2006, asking "to be admitted for detoxification from her prescription narcotics."  *Id*. at 1021.  This medical record continues:

> She is on prescription narcotics for chronic pelvic pain for which there has been no known etiology, this despite having 6 laparoscopies of her pelvic area and she has had a complete hysterectomy.  She has been seen by multiple pain specialists and has been to the Cleveland Clinic.  She said the Cleveland Clinic changed one of her antidepressants which has caused her to pull her hair out.  She also states that she has had loss of appetite and has

6

> gone from a size 12 to a size 4.  This was last August to last December that
> she lost weight and has maintained the size 4 since then…. She said that if
> she does not get admitted so that she can get off these drugs she is going to
> kill herself.  She is very upset and expresses concern over the possibility of
> losing her children if she cannot get her life under control and she states that
> everything is out of control right now because of the pain and the pain
> medicine….

*Id*.  She was diagnosed with severe depression and narcotic addiction.  *Id*.  at 1022.

Plaintiff stated that she was not actively suicidal and felt comfortable with trying a

Duragesic patch to relieve her pain.  *Id*. at 1024.

In June 2010, Plaintiff was hospitalized for suicidal ideation after taking a double

dose of medication, Soma.  She was diagnosed with an adjustment disorder with mixed

disturbance of emotion and conduct, benzodiazepine abuse, and cannabis

abuse/dependence.  (PageID# 1392-1411).

### Amita Oza, M.D.

Dr. Oza examined Plaintiff in February 2007 at the request of the state agency.

Plaintiff was age 39 at that time.  Dr. Oza's impressions reported that Plaintiff had

"chronic pelvic pain which is felt secondary to endometriosis and adhesions.  She is on

fentanyl patch, Soma, Flexeril.  She seems to be over medicated even at this time.  She

feels very fatigued and tired while on medication but without it she still has pain."  *Id*. at

982.  Dr. Oza concluded, "So work related activities would be accordingly affected.  I do

not think she has any musculoskeletal problems."  *Id*. at 983.  On the date of Dr. Oza's

report, radiographs of Plaintiff's lumbar spine showed six lumbar type vertebral bodies

with otherwise normal results.  *Id*. at 984.

**Bhimavarapu K. Reddy, M.D.**

In April 2007, Plaintiff consulted with Dr. Reddy who is "Triple Board Certified in Pain Medicine.  Board Certified in Anesthesia, Critical Care Medicine & Hospice Palliative Care."  *Id*. at 1464.  It appears that Dr. Reddy spoke at length with Plaintiff about the history of her pain.  Plaintiff informed Dr. Reddy that she had bilateral pelvic pain.  Dr. Reddy further reported:

> [Plaintiff] states that she has had this pain for several years beginning approximately 1992.  She has had several laparoscopy surgeries and states that these did help for a while and that after the laparoscopy in 1995, she was able to run a marathon in 1996.  She states that in late 1997 or 1998 the pain came on while she was running, so she thought that this was more of endometriosis.  In 2002, she states that she had constant pain and begged for hysterectomy, but this was not successful in treating the pain that actually the pain has been continuous since then.  She states that she has had some relief from the pain with physical therapy and trigger point injection.  She states that she was in a verbally and emotionally abusive marriage and that the pain came right back most likely due to … stressors.  She states that the frequency gets worse with flare ups after high periods of emotional stress, and with physical activity such as walking, sitting, standing for long periods of time, or carrying heavy items….  She describes the pain as a dull ache, cramping, pinching, and is sharply delineated.  She does also include burning as part of the character of the pain.  She also states that she has heaviness and weakness at the top of her lets and that her legs also feel like … they will give out by the time she as climbed to the top of the stairs.  She states that the pain is relieved by  rest, lying down, heating pad, physical therapy, and that it is also relieved by Soma which are the only muscle relaxers that do work and she takes these at night to help her sleep….

*Id*. at 1463.

Dr. Reddy recommended to Dr. Mesker that Plaintiff's treatment consist of trigger-

point injections, physical therapy, and possible nerve block if the trigger-point injections are not beneficial. *Id*. at 1464. She also recommended that Plaintiff "continue with counseling to help her with her past history of an abusive marriage and to help her deal with the pain issues….." *Id*. Dr. Reddy found Plaintiff was a "reliable historian." *Id*.

In May 2007, Dr. Reddy completed a form for the Ohio Bureau of Vocational Rehabilitation. She concluded that Plaintiff could not work full time, could only work part time, and yet could participate in a training program. *Id*. at 1460.

**Matthew Hodges, D.O.**

Plaintiff consulted with Dr. Hodges in April 2009. He is Board Certified in Physical Medicine and Rehabilitation Pain Management. During examination, Dr. Hodges discovered that Plaintiff "does have greater than 12-13 tender points of 18 positive for diagnostic criteria for fibromyalgia." *Id*. at 1150. Dr. Hodges diagnosed Plaintiff with "[m]ultiple body aches and pain, likely fibromyalgia," low back pain, and myofascial pain. *Id*. He recommended a graduated progressive cardiovascular program because "[t]his has been one of the few things in literature that has been demonstrated to improve fibromyalgia." *Id*. He also recommended that Plaintiff follow up "with Dr. Mahajan for control of some of her anxiety related issues as this seems to be rather pertinent for her today." *Id*. at 1151.

**Townsend Smith, M.D.**

Pain specialist Dr. Smith examined Plaintiff in March 2010 and found diffuse pain

over her cervical, thoracic, and lumbar spine.  Her most significant pain localized over her sacroiliac joint region.  Dr. Smith also found 5/5 muscle strength of the lower extremities. He noted that Plaintiff could ambulate across the office floor.  He diagnosed Plaintiff with fibromyalgia, degenerative disc disease, myofascial pain syndrome, and sacroilliitis.  *Id*. at 1257-58.

### Mujeeb Ranginwala, M.D.

Dr. Ranginwala, a rheumatologist, saw Plaintiff of three occasions in December 2010 and January 2011 for evaluation of generalized pains in different areas including the neck, back, arms, and legs.  *Id*. at 1649-53.  Dr. Ranginwala reported, "At this point in time, based on current clinical examination[,] her condition is quite consistent with the diagnosis of myofascial pain.  I do not find any evidence of underlying connective tissue disorder or inflammatory arthritis."  *Id*. at 1654.  Plaintiff's musculoskeletal examination failed to reveal any active synovitis of the joints.  Plaintiff had a "few tender points" in the paraspinal muscle of her neck and back, but diagnostic work-up was negative for either a connective tissue disorder or inflammatory arthritis.  *Id*. at 1654.

### Mervet K. Saleh, M.D.

Plaintiff saw Dr. Saleh in January 2011.  He is a pain-management specialist.  *Id*. at 1837-43.  On examination, Dr. Saleh found Plaintiff had ten trigger points.  *Id*. at 1840. Straight-leg-raising tests were positive for lower back and leg pain bilaterally.  Seated straight-leg raising tests were likewise positive for lower back and leg pain bilaterally.  *Id*.

at 1841. "Special testing of the bilateral lower extremities reveals piriformis syndrome tests are all positive bilaterally…." *Id*. at 1841-42. Dr. Saleh diagnosed Plaintiff with myofascial pain syndrome, cervical and lumbar radiculopathy, degenerative disc disease of the lumbar spine, and lumbar intervertebral disc displacement. *Id*. at 1842.

In February 2011, Plaintiff underwent an MRI of her cervical spine, which was negative. *Id*. at 1836. X-rays of the lumbosacral spine in July 2011 were also negative. *Id*. at 1835.

Dr. Saleh completed a Basic Medical Form in February 2012 in which he identified Plaintiff's medical conditions as fibromyalgia/myofascial pain syndrome, neck pull, spinal stenosis, radiculopathy. Id. at 1874. Dr. Saleh also opined that Plaintiff would have moderate functional limitations in her ability to stand, sit, lift, carry, push, pull, reach, and perform repetitive movements. *Id*. at 1875. Dr. Saleh based his opinion on physical examinations in which Plaintiff demonstrated decreased range of motion of the cervical and lumbar spines making bending, pushing/pulling and reaching painful. Dr. Saleh opined that Plaintiff was unemployable for twelve months or more. *Id*. He also explained that Plaintiff "suffers from chronic myofascial pain, pelvic pain, chronic low back pain, [with] radiculopathy and chronic neck pain." *Id*. at 1876.

### Lynn Robbins, M.D.

Neurosurgeon Dr. Robbins examined Plaintiff in April 2014. He reported that Plaintiff was age forty-six and had experienced back pan and some pain in her lower legs

for a few years. She told Dr. Robbins that she had obtained some benefit from current pain-management treatment and past physical therapy "but it seems like she 'can't round the corner and start getting better ….'" *Id*. at 2325 (quoting Plaintiff, in part). Dr. Robbins recommended, after observing Plaintiff's gait is "generally good" and after reviewing an MRI with her, that she continue with nonsurgical management. *Id*.

### Ellen Ballerene, M.D.

Plaintiff also received mental health treatment from psychiatrist Dr. Ballarene at Samaritan Behavioral Health from June 2010 thorough at least June 2014. *Id*. at 1614-45,1659-74, 1916-2014, 2202-21, 2258-2302, 2360-2404. Dr. Ballerene diagnosed Plaintiff with depressive and generalized anxiety disorders. Dr. Ballerene's treatment notes show that Plaintiff was seen for medication management with memory complaints, distractibility, and a depressed mood. Mental status examinations were generally unremarkable and stable. *Id.*

In February 2013, Dr. Ballerene completed a supplemental questionnaire that asked her to rate the impact Plaintiff's mental impairments would have on her ability to perform work. The scale used in the form was from "moderate" to "moderately severe" to "severe." The form defines the phrase "moderately severe" as, "An impairment which significantly limits mental capacity to perform basic work related functions." *Id*. at 1911. Dr. Ballerine opined that Plaintiff was limited to a moderately severe degree in her ability to understand and follow instructions; work in contact with others; perform varied tasks;

12

achieve goals; respond to time limits; sustain attention; be prompt; perform activities within a schedule; and maintain regular attendance. *Id*. at 1911-14. Dr. Ballerene believed that Plaintiff was severely limited in her ability to perform complex tasks, to tolerate stress in a work environment, and to "[c]omplete a normal work day and work week without interruption from psychologically and/or physically based symptoms and perform at a consistent pace without [an] unreasonable number and lengths of rest periods." *Id*. at 1913.

Dr. Ballerene diagnosed Plaintiff with "generalized anxiety, depression exacerbated by chronic pain & physical limitations, Trichotillomania." *Id*. She noted that Plaintiff experience crying spells and difficulty maintaining relationships. She described Plaintiff's prognosis as fair to poor. She further noted, "some improvement but requires ongoing treatment, has periods of decompensation where it is harder to function or maintain routines." *Id*. Plaintiff also had trouble with schedules and complex tasks, according to Dr. Ballerene. The duration of these problems was since 2005 and her limitations can be expected to last for 12 month or longer. Lastly, Dr. Ballerene reported that Plaintiff's psychiatric symptoms "wax and wane, but due to episodes of decompensation, it is not believed she can maintain full time employment." *Id*. at 1914.

## III. <u>"Disability" Defined and the ALJ's Decision</u>

To be eligible for Supplement Security Income or Disability Insurance Benefits a claimant must be under a "disability" within the definition of the Social Security Act. *See*

13

42 U.S.C. §§ 423(a), (d), 1382c(a).  Narrowed to its statutory meaning, a "disability"
includes only physical or mental impairments that are both "medically determinable" and
severe enough to prevent the applicant from (1) performing his or her past job and (2)
engaging in "substantial gainful activity" that is available in the regional or national
economies.  *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

To determine whether Plaintiff was under a benefits-qualifying disability, ALJ
Motta applied the Social Security Administration's five-step sequential evaluation
procedure.  *See* 20 C.F.R. § 404.1520(a)(4).  ALJ Motta found (step two) that Plaintiff has
the severe impairments of "lumbar degenerative disc disease, myofascial pain disorder of
unclear etiology but involving narcotic abuse/misuse, and depressive disorder, and an
anxiety disorder."  (Doc. #5, *PageID #*57).  ALJ Motta did not specifically address
whether Plaintiff had a severe impairment of fibromyalgia.  *See id*. at 60-61.

The ALJ concluded (step three) that Plaintiff's impairments or combination of
impairments did not meet or equal the criteria of a Listing-level impairment, including
Listing § 1.00, *et seq*. (musculoskeletal),  § 12.04 (affective disorders), and § 12.06
(anxiety-related disorders).  (Doc. #5, *PageID #s* 61-64).  Doing so, the ALJ did not
discuss fibromyalgia.

ALJ Motta next considered (step four) Plaintiff's residual functional capacity or the
most she can do despite her limitations. 20 C.F.R. § 404.1545(a); *see Howard v.
Commissioner of Social Sec.*, 276 F.3d 235, 239 (6th Cir. 2002).  She concluded:

14

> [Plaintiff] has the residual functional capacity to perform a reduced range of light work as defined in 20 CFR 404.1567(b) and 416.967(b), that is, lifting up to 20 pounds occasionally and 10 pounds frequently; postural requirements of work, such as climbing stairs and ramps, balancing, stooping, kneeling, crouching and crawling are limited to occasionally; the individual cannot climb ladders, ropes, or scaffolds; should not be exposed to hazards, such as moving or dangerous machinery or working at unprotected heights; only simple, repetitive tasks; low stress work, *i.e.*, no strict production quotas or fast pace and only routine work with few changes in the work setting; and no more than occasional contact with co-workers, supervisors, and the public.

*Id*. at 64. In support of this assessment, ALJ Motta found, in part, "[Plaintiff] claims to have fibromyalgia, but there is no record documenting a positive tender point examination with specific numbers and sites, which is one of the initial requirements to establish that diagnosis…." *Id*. at 67. ALJ Motta also found that Plaintiff could not perform her past relevant work. *Id* at 73.

ALJ Motta found (step five) that a significant number of jobs exist in the regional economy that Plaintiff could perform, for example, mail clerk, office helper, photocopy machine operator, and tube operator. This led to ALJ Motta's ultimate conclusion that Plaintiff was not under a benefits-qualifying disability. *Id*. at 73-75.

## IV.    **Judicial Review**

Judicial review of an ALJ's decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec*., 478 F.3d 742, 745-46 (6th Cir. 2007).

15

Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those findings. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met— that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance …. " *Rogers*, 486 F.3d at 241; *see Gentry*, 741 F.3d at 722.

The second line of judicial inquiry—reviewing for correctness the ALJ's legal criteria—may result in reversal even when the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## V.    Discussion

### A.    The Parties' Contentions

Plaintiff argues that ALJ Motta failed to adequately consider the history of her medical treatment for fibromyalgia symptoms.  Because of this, Plaintiff contends that substantial evidence fails to support (1) the ALJ's omission of fibromyalgia as one of her severe impairments, (2) the ALJ's assessment of her residual functional capacity; and (3) the ALJ's finding that she was not entirely credible.  In addition, Plaintiff contends that the ALJ erred by failing to provide "good reasons" for not assigning controlling weight, or even significant weight, to the opinions of treating physicians, Dr. Mesker, Dr. Saleh, Dr. Reddy, Dr. Ballerene, and Mahajan.

The Commissioner argues that the ALJ properly excluded fibromyalgia from Plaintiff's severe impairments because she cannot show that fibromyalgia was diagnosed by any acceptable process.  The Commissioner further argues that the ALJ properly placed little weight on Dr. Mesker's opinions and properly evaluated the opinions provided by Drs. Saleh, Reddy, Ballerene, and Mahajan.  And, the Commissioner asserts that the ALJ reasonably evaluated Plaintiff's credibility.

### B.    Analysis

Fibromyalgia is "a complex medical condition characterized primarily by widespread pain in the joints, muscles, tendons, or nearby soft tissues that has persisted for at least 3 months."  Soc. Sec. R. 12-2p, 2012 WL 3017612, *2.  It "causes severe

musculoskeletal pain which is accompanied by stiffness and fatigue due to sleep disturbances." *Preston v. Sec'y of Health and Human Services*, 854 F.2d 815, 817 (6th Cir. 1988); *see also Rogers*, 486 F.3d at 243, n.3 (and cases cited therein). "[U]nlike medical conditions that can be confirmed by objective testing, fibromyalgia patients present no objectively alarming signs. Rather fibromyalgia patients manifest normal muscle strength and neurological reactions and have a full range of motion." *Rogers*, 486 F.3d at 244.

The Social Security Administration recognizes that fibromyalgia, "when it is established by appropriate medical evidence," is a medically determinable impairment and "can be the basis for a finding of disability. Soc. Sec. R. 12-2p, 2012 WL 3017612, *2; *see Minor v. Comm'r of Soc. Sec*., 513 F. App'x. 417, 434 (6th Cir. 2013) ("We have repeatedly recognized that fibromyalgia can be a severe and disabling impairment.").

In the present case, ALJ Motta found at step four of her sequential evaluation:

> [Plaintiff] claims to have fibromyalgia, but there is no record documenting a positive tender point examination with specific numbers and sites, which is one of the initial requirements to establish that diagnosis….

(Doc. #5, *PageID* #67). This is flawed in several ways. First, the ALJ improperly reads "initial requirements …" into the diagnostic criteria for fibromyalgia that are not present. Ruling 12-2p recognizes that the diagnostic criteria for fibromyalgia requires at least 11 positive tender points out of 18 on physical examination. 2012 WL 3017612, *3. Ruling 12-2p also lists the 18 tender-point sites and notes that tender points must be found

bilaterally and above and below the waist.  *Id.*  But, there is no mandatory language in this Ruling that requires medical sources to specify which of the 18 sites were tender upon physical examination.  *See id.*; *cf. Rogers*, 486 F.3d at 244 ("The process of diagnosing fibromyalgia includes (1) the testing of a series of focal points for tenderness and (2) the ruling out of other possible conditions through objective medical and clinical trials.").  Thus, to the extent the ALJ required medical records documenting the "specific number and sites …" of Plaintiff's tender points, her decision incorrectly reads requirements into Ruling 12-2p, 2012 WL 3017612, *2-*3, that are not there.

Second, the ALJ's finding overlooked or ignored that in April 2009, Dr. Hodges performed a physical examination of Plaintiff and found, "[s]he does have greater than 12-13 tender points of 18 positive for diagnostic criteria for fibromyalgia."  *Id.* at 1150.  Because Dr. Hodges reached the medical conclusion that the tender points revealed by his examination met the diagnostic criteria for fibromyalgia, it was error for the ALJ to conclude otherwise by substituting her own lay opinion in place of Dr. Hodge's medical conclusion.  *See Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 194 (6th Cir. 2009) "[A]n ALJ 'may not substitute his [or her] own medical judgment for that of the treating physician where the opinion of the treating physician is supported by the medical evidence.'" (citing, in part, *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings")).

19

Third, the ALJ did not consider the other criteria for diagnosing fibromyalgia set forth in Ruling 12-2p, which does not require evidence of tender points.  The Ruling provides:

> Based on these criteria, we may find that a person has an MDI [medically determinable impairment] of FM [fibromyalgia] if he or she has all three of the following criteria:
>
> 1.      A history of widespread pain;
>
> 2.      Repeated manifestations of six or more FM symptoms, signs, or co-occurring conditions, especially manifestations of fatigue, cognitive or memory problems ("fibro fog"), waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome; and
>
> 3.      Evidence that other disorders that could cause these repeated manifestations of symptoms, signs, or co-occurring conditions were excluded.

2012 WL 3104869, *3 (internal citations omitted).  Thus, even assuming that the record lacks evidence showing Plaintiff has the requisite number of positive tender points to establish fibromyalgia, the ALJ erred by not considering whether Plaintiff met this alternative method provided in Ruling 12-2p.  *Id*.

Plaintiff contends that the ALJ erred by not finding, at step two of her sequential evaluation, that her severe impairments included fibromyalgia.  The Commissioner argues that the ALJ properly determined that the record fails to support more than a diagnosis of fibromyalgia and does not show that she has a medically determinable impairment of fibromyalgia as required by Ruling 12-2p.

20

The Commissioner's arguments are not persuasive because the ALJ erred by not applying both alternative methods in Ruling 12-2p to determine whether Plaintiff met the criteria for fibromyalgia. This problem with the ALJ's decision at step four means that it was not harmless error for the ALJ to omit considering whether Plaintiff's severe impairments included fibromyalgia. That such consideration was warranted is at least suggested by the previous two ALJ's conclusions that Plaintiff had the severe impairments of fibromyalgia. *See* Doc 5, *PageID* #189, 222. Indeed, the more recent of those decisions found that Plaintiff's fibromyalgia and myofascial syndrome constitute severe impairments. *Id*. at 222.

Plaintiff, moreover, correctly points out that the record lacks substantial evidence supporting the ALJ's step-two determination that the etiology of her myofascial pain disorder was unclear but involved "narcotic abuse/misuse." *Id*. at 57. Although there is evidence in the record that Plaintiff has engaged in narcotic abuse or misuse, there is no evidence of causation between this health problem and her myofascial pain disorder. The reference to "narcotic abuse/misuse" seems more like a way of belittling or minimizing the significance of Plaintiff's myofascial pain disorder for the purpose of supporting the ALJ's non-disability conclusion, rather than an impartial and thorough review of the evidence. The ALJ, moreover, cited Exhibit 100F as an example of what she viewed as a lack of clinical observations consistent with functional impairments. Exhibit 100F documents Plaintiff's visits to Dr. Mesker in January 2014 and September 2013 for

21

urinary tract infections, *see id*. at 2307 ("Plaintiff presents with UTI …."), 2311, 2013; in May 2013 for a bruised ankle, *id*. at 2317; and visits for other relatively minor problems. Consequently, it makes logical makes sense that those records would not identify clinical observations consistent with a significant functional impairment, as the ALJ believed.

In addition, once the ALJ found a lack of the required number of positive tender points, she did not address whether or not Plaintiff met the remaining fibromyalgia criteria in Soc. Sec. R. 12-2p.  This left the ALJ free to repeatedly rely on the lack of objective evidence when weighing the treating sources' medical opinions.  This constituted error because the record contains strong evidence, while contrary evidence is weak, that Plaintiff's fibromyalgia satisfy the positive-trigger-point requirements and other criteria identified in Ruling 12-2p.  *See infra*, §VI.  Given this, the lack of objective medical evidence and normal findings on physical exams were not valid reasons to discount the treating sources' opinions or to find Plaintiff's credibility wanting.  "[U]nlike medical conditions that can be confirmed by objective testing, fibromyalgia patients present no objectively alarming signs.  Rather fibromyalgia patients manifest normal strength and neurological reactions and have a full range of motion."  *Rogers*, 486 F.3d at 243 (citing *Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 820 (6th Cir. 1988) (noting that objective tests are of little relevance in determining the existence or severity of fibromyalgia) (other citation omitted).  Thus, the ALJ's findings that the record lacked

objective evidence and contained normal findings on physical exams supported the treating physicians' diagnosis of fibromyalgia and Plaintiff's credibility.

### C.   <u>Dr. Mesker</u>

Plaintiff maintains that the ALJ erred by failing to provide "good reasons" for not assigning controlling weight, or even significant weight, to the opinions his treating physicians, including Dr. Mesker.  The Commissioner asserts that the ALJ properly placed little weight on each of Dr. Mesker's opinions (1) because his opinions were based "primarily on [Plaintiff's] subjective complaints, which were less than credible" (Doc. #5, *PageID* #30), and because Dr. Mesker ignored the objective and clinical data in the record, including his own records, that showed Plaintiff's symptoms were no more than mild.

> As a general matter, an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination (a "nonexamining source"), and an opinion from a medical source who regularly treats the claimant (a "treating source") is afforded more weight than that from a source who has examined the claimant but does not have an ongoing treatment relationship (a "nontreating source").  In other words, "[t]he regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker." Soc. Sec. Rul. No. 96–6p, 1996 WL 374180, at *2 (Soc. Sec. Admin. July 2, 1996).

*Gayheart v. Comm'r Social Sec.*, 710 F.3d 365, 375 (6th Cir. 2013) (citations omitted).

To effect these progressively more rigorous tests, the Regulations adopt the treating physician rule.  The rule is straightforward:

> Treating-source opinions must be given "controlling weight" if two

23

conditions are met: (1) the opinion is "well supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) the opinion "is not inconsistent with other substantial evidence in [a claimant's] case record."

*Gayheart*, 710 F.3d at 376 (citation omitted); *see Gentry*, 741 F.3d at 723.  If both conditions do not exist, the ALJ's review must continue:

> When the treating physician's opinion is not controlling, the ALJ, in determining how much weight is appropriate, must consider a host of factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors.

*Rogers*, 486 F.3d at 242 (citing *Wilson*, 378 F.3d at 544).

In rejecting Dr. Mesker's opinions, ALJ Motta determined that they were based primarily on Plaintiff's subjective complaints, which ALJ Motta determined were less than fully credible; that Dr. Mesker ignored the objective and clinical data in the record, including his own, which showed that Plaintiff's symptoms were no more than mild. Regarding Plaintiff's prescription for a cane, for which the case was remanded, ALJ Motta determined that Dr. Mesker, who was not an orthopedic or spine specialist, prescribed the cane based on Plaintiff's subjective allegations of leg numbness.  (Doc. #5, *PageID* #70).  ALJ Motta declined to give Dr. Mesker's opinions either controlling or great weight and instead relied on the 2010 opinions from the State Agency medical consultants, Dr. Cruz and Dr. Long.  *Id*. at 68 (citing to *PageID* #s 1260-67, 1445).

As noted above, Dr. Mesker has been Plaintiff's long-term treating physician; indeed,

24

he has treated her since at least the 2002.  Dr. Mesker has been responsible for coordinating Plaintiff's care with the other specialists of record and he is aware of Plaintiff's diagnoses and treatments provided by her other health care providers.  Based on his long-term treatment relationship with Plaintiff and his extensive knowledge of her health conditions, including fibromyalgia, Dr. Mesker essentially opined that Plaintiff was disabled.

The record is replete with evidence that supports Dr. Mesker's diagnosis of fibromyalgia and his disability opinions.  The over two thousand pages of treatment notes, and medical evidence (including medical opinions) spanning more than twelve years, consistently make note of Plaintiff's severe physical pain.  Treatment or progress notes evidence that her objective test results have been mostly normal or show mild findings, as the ALJ recognized. Dr. Mesker's opinions, moreover, are based upon a substantial number of consistent treatment notes spread over a significant period of time, as well as the his reading of Plaintiff's 2010 MRI and 2013 EMG.[4]  And, in light of the problem discussed above created by the ALJ's errors with regard to Plaintiff's fibromyalgia, the ALJ incorrectly relied on the lack of objective evidence or the presence of normal findings to discount Dr. Mesker's opinions. Substantial evidence, therefore, does not support the ALJ's reasons for placing little weight on Dr. Mesker's opinions.

Rather than crediting Dr. Mesker's opinions, the ALJ placed significant weight on the state-agency record reviewers.  The ALJ based her reliance on their opinions by finding them

---

[4] EMG testing performed on May 20, 2013, showed mild left L5 radiculopathy with no evidence of lumbosacral plexopathy, generalized peripheral neuropathy, myopathy, or motor neuron disease.  An MRI of the lumbar spine, taken on March 12, 2010, showed only mild degenerative disk disease.  (Doc. #5, *PageID* #s 1300-01, 2733-34).

supported by or consistent with "the overall evidence of record."  (Doc. #5, *PageID* #68).  The

ALJ provides no further explanation.  This is problematic in the present case because of the

over two-thousand pages of medical records, which (as noted above) spans a lengthy time

period.  Given this vast amount of evidence, the ALJ's reliance on "the overall medical

records" fails to connect in any meaningful way to the medical evidence of record.  The ALJ,

instead, an inaccurate holistic view of the medical records, ending up with a general sense of

consistency between the more than two thousand-page medical records and these record

reviewers' opinions.  Although consistency with "the record as a whole…" is a factor for the

ALJ to consider, *see* Soc. Sec. R. 96-6p, 1996 WL 374180, *2 (July 2, 1996), the record as

whole included "other medical opinions …"  *Id.*  The record-reviewers' opinions were not

consistent with strong contrary medical opinions, such as Dr. Mesker's.  In light of this, a

reasonable mind would not accept the ALJ's holistic view of the consistency of the record as a

whole as adequate to support her acceptance of the record reviewers' opinions.  In other words,

substantial evidence does not support the ALJ's reliance on the purported consistency of the

record-reviewers' opinions with the record as a whole.  *See Blakley*, 581 F.3d at 407

(Substantial evidence is present when a 'reasonable mind might accept the relevant evidence as

adequate to support a conclusion.'").

In addition, the treating physicians of record give no indication that they doubted

Plaintiff's subjective description of her symptoms, including pain.  In this way, the record here

is similar to the record in *Felisky v. Bowen*, 35 F.3d 1027 (6th Cir. 1994) where the ALJ

26

discounted the plaintiff's credibility without substantial supporting evidence.  The record in

*Felisky* showed:

> Many doctors have examined Felisky over a period of years, and two
> doctors have examined her continuously over the past several years. These
> doctors are experienced in the field of rheumatology, yet they have not been able
> to agree on a unifying diagnosis.  Surely, if they had any doubts about Felisky's
> credibility, some mention of it would appear in the medical record. In ruling out
> possibilities, the examining physicians must have ruled out the possibility that
> Felisky is a hypochondriac or that she is exaggerating her symptoms. In Dr.
> Castor's words, an "astounding collection" of tests and examinations have been
> performed on Felisky, and several physicians have invested great amounts of
> effort in attempting to identify her problems. We cannot believe that this effort
> would continue if they did not believe that Felisky was accurately describing her
> symptoms.

*Id.* at 1040.  The same is true of the record in the present case.  The Commissioner may

disagree due to the ALJ's recognition that "Dr. Saleh, a treating source, reported that the

claimant exhibited positive Waddell's sign on physical examination, which is indicative of

symptom exaggeration."  (Doc. #5, *PageID* #67) (citing Exh. 75, p. 138, *PageID* #1840)).  Yet,

the ALJ's reliance on a single positive Waddell's sign on one occasion in this vast medical

record does not constitute a meaningful distinction between the instant case and *Felisky.*

Additionally, the ALJ misunderstood a positive Waddell's sign to indicate that Plaintiff was

exaggerating her symptoms.  As the Sixth Circuit has explained:

> "Waddell's signs" are the most well-known of several tests developed to detect
> non-organic causes of low back pain.  Samuel D. Hodge, Jr. & Nicole Marie
> Saitta, *What Does It Mean When A Physician Reports That A Patient Exhibits
> Waddell's Signs?,* 16 Mich. St. Univ. J. Med. & L. 143, 155–56 (2012).  "A
> positive Waddell's sign may indicate that the patient's pain has a psychological
> component rather than organic causes.  While it is a common perception in the
> litigation arena that these signs are proof of malingering and fraud, they merely
> describe a constellation of signs used to identify pain in those who need more

> detailed psychological assessments." *Id.* (footnote omitted). "The literature ...
> reveals that there is no association between positive Waddell signs and the
> identification of secondary gain and malingering. Patients with strong
> psychological components to their pain often display these signs as well." *Id.* at
> 160 (footnote omitted).

*Minor v. Comm'r of Soc. Sec.*, 513 F. App'x. 417, 422 n.15 (6th Cir. 2013). The ALJ's

reliance on a single reference to a positive Waddell's sign was overly selective. On at least

three occasions, examinations showed negative Waddell's signs. (Doc. #5, *PageID #s* 2534,

2630, 2635). The ALJ erred by accepting evidence of one positive Waddell's sign when other

physical exams showed negative Waddell's signs. *See Norris v. Comm'r of Soc. Sec.*, 2016

WL 2636310, at *8 (S.D. Ohio 2016) (and cases cited therein) (Litkovitz, M.J.), Report &

Recommendation adopted, 2016 WL 3228399 (S.D. Ohio 2016); *see also Brooks v. Comm'r of*

*Soc. Sec.*, 531 F. App'x 636, 641 (6th Cir. 2013) ("a substantiality of evidence evaluation does

not permit a selective reading of the record.").

## VI.    **Remand for Benefits**

Under sentence 4 of 42 U.S.C. §405(g), the Court has authority to affirm, modify,

or reverse the Commissioner's decision "with or without remanding the cause for

rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Consequently, a remand under

sentence 4 may result in the need for further proceedings or an immediate award of

benefits. *E.g., Blakley*, 581 F.3d at 410; *Felisky*, 35 F.3d at 1041. "Generally, benefits

may be awarded immediately 'only if all essential factual issues have been resolved and

the record adequately establishes a plaintiff's entitlement to benefits.'" *Kalmbach v.*

28

*Comm'r of Soc. Sec.,* 409 Fed. App'x 852, 865 (6th Cir. 2011) (quoting, in part, *Faucher v.*

*Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994)). "A judicial award of

benefits is proper only where the proof of disability is overwhelming or where the proof of

disability is strong and evidence to the contrary is lacking." *Faucher*, 17 F.3d at 176.

In the present case, a remand for award of benefits is warranted because the

evidence of Plaintiff's disability is either overwhelming or strong while contrary evidence is

lacking.   Plaintiff's  treating sources have opined that Plaintiff is unemployable due to her

exertional and psychological impairments and the record lacks meaningful probative evidence

or analysis to the contrary.  In addition, there is no reasonable justification to delay an award of

benefits while the matter is remanded for further proceedings before a fourth ALJ and a fourth

administrative decision when this case is already seven years old.

Accordingly, a reversal of the ALJ's decision and a remand for payment of benefits

are warranted.

## IT IS THEREFORE RECOMMENDED THAT:

1.     The Commissioner's non-disability finding be reversed;

2.     This matter be remanded to the Social Security Administration for payment of
       Disability Insurance Benefits and Supplemental Security Income to Plaintiff
       Krista E. Moser in connection with the applications she protectively filed on
       November 3, 2009; and

3.     The case be terminated on the docket of this Court.


 February 9, 2017                              *s/Sharon L. Ovington*
                                               Sharon L. Ovington
                                               United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations.  Pursuant to Fed. R. Civ. P. 6(d), this period is extended to **SEVENTEEN** days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F).  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947, 949-50 (6th Cir. 1981).